ADAMS et al. v. UNITED STATES
(five cases).

THE GLEN WHITE.

THE NEWTON.

THE KOPPERSTON.

THE JAMES L. RICHARDS.

THE WINDING GULF.
Nos. 1521–1525, 1530.

United States District Court
D. Massachusetts.

Jan. 7, 1952.

957

Charles S. Bolster, and Bingham, Dana & Gould, all of Boston, Mass., for plaintiff.

George F. Garrity, U. S. Atty., Edward O. Gourdin, Asst. U. S. Atty., Boston, Mass., for defendant.

FORD, District Judge.

· These libels are brought by the trustees of Eastern Gas and Fuel Associates (hereinafter called Eastern), under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq., to recover in contract for certain sums alleged to be due from the United States under charter parties covering vessels formerly owned by libelants, and under an agreement for settlement of certain of libelants' claims under the charter parties.

These vessels, the S. S. Glen White in No. 1521, the S. S. Newton in No. 1523, the

S. S. Kopperston in No. 1524, the S. S. James L. Richards in No. 1525, and the S. S. Winding Gulf in No. 1530 are colliers which in 1942 were owned by Eastern and in that year were requisitioned on behalf of the United States by the War Shipping Administration. At various dates in May, 1942, requisition time charters were executed by the War Shipping Administration and Eastern covering these vessels. In June, 1944, amended time charters were executed covering the same vessels.

These amended charters were on War Shipping Administration Form No. 101 (Rev.) 4/4/44 Warshiptime (Rev.) (Collier). Clause 11.A. of Part II of said charters gave the United States the right to install equipment, gear or armament on the chartered vessels, and provided that the United States "* * * shall, before redelivery and at its expense and on its time, remove any equipment, gear and armament installed * * * and restore the Vessel to her condition prior to any such installations, * * *." Clause 11.D. provided that the United States, in lieu of the work or repairs required under 11.A. "* * * may, at its option, discharge such obligations by payment to the Owner in advance of an amount for reconditioning sufficient to provide for such work or repairs which amount shall also include compensation at the rate of hire that would otherwise have been payable under this Charter, for the time reasonably required under then existing conditions to complete such work or repairs and compensation for other expenses incident to such work or repairs. If the Owner and Charterer agree such obligation may be discharged by a mutually satisfactory agreement."

It has been stipulated that certain equipment, gear and armament was installed on each of the vessels by the United States while the vessels were under charter, that the vessels were redelivered to the owners in the early part of July, 1946, that the previously mentioned installations were not removed by the United States prior to redelivery of the vessels, and that Eastern thereafter did not remove any of these installations, or incur any expense for the removal of them.

These vessels were colliers. At least from March 1, 1946 until they were redelivered to libelants and thereafter until, as appears later, they were again turned over to the United States, they were engaged in carrying commercial cargo for private shippers, chiefly cargoes of coal from ports in Virginia to ports in the northern states, for the most part in the Boston and New York areas. In some weeks during this period some of the vessels were not operating because they were tied up for repairs, because of strikes at the coal mines, or because the operating licenses of the vessels had expired. At no time during this period were any of these vessels engaged in any other type of activity than the carrying of commercial cargoes.

At some time after redelivery of the vessels, Eastern entered into negotiations with representatives of the United States looking toward settlement of its claims under the charters, including claims for allowances for compensation for the cost of removing the equipment installed on the vessels by the United States. These negotiations terminated in an exchange of letters between R. C. Goodwin, Vice-President of Eastern, in charge of the operation of its vessels, and L. B. Scott, Director of the Division of Redelivery of Chartered Vessels for the War Shipping Administration, and after September 1, 1946 for the United States Maritime Commission, into which the duties of the War Shipping Administration were absorbed on that date. On September 19, 1946, Scott sent a letter to Eastern of which the following paragraphs referred to the vessels involved in this suit:

"The remaining vessels covered in your negotiations with Captain Mullany, the S. S. Glen White, S. S. James L. Richards, S. S. Kopperston, S. S. Newton and S. S. Winding Gulf, have been offered by you for trade. As an element in the calculation of the allowance to be made, the obligation of the Government to restore the vessels as required by the charters must be considered. It is suggested, therefore, that as to these vessels lump sum settlements be formalized on the same basis as on the vessels which are not to be traded in.

"We offer, in consideration of the release by the owner of all of the charterer's obligations on redelivery to perform repairs, removals, restoration or work with respect to the vessels, including but not limited to claims for hire or loss of time involved and adjustments for ports of redelivery, to pay the following amounts with respect to the vessels listed below:

| | |
|---|---|
| SS Glen White | $19,770.00 plus 4 days hire |
| SS James L. Richards | 15,510.00 plus 4 days hire |
| SS Kopperston | 24,012.00 plus 4 days hire |
| SS Newton | 9,155.00 plus 4 days hire |
| SS Winding Gulf | 12,375.00 plus 4 days hire. |

"If the foregoing proposals are acceptable to you, please notify us to that effect and we will forward settlement agreements embodying these terms."

Goodwin, on September 23, wrote to Scott in reply, "Replying to your letter of September 19th, we are agreeable to accepting the proposals in your offer * * *." On October 4, 1946, Scott sent to Goodwin formal addenda to the various charters containing provisions for the payment of the sums mentioned in his earlier letter and for the releases by the owner mentioned in that letter. These addenda were in quadruplicate, to be executed by the owner and returned to Scott's office for execution on behalf of the government, upon which Counterparts II were to be returned to Eastern. These documents were all executed by Goodwin on behalf of Eastern and sent to the Maritime Commission on October 22, 1946. There was no evidence that Scott or any one else ever signed these documents on behalf of the United States, although it is conceded they were received by the Commission. Counterparts II were never returned to Eastern, and a careful search of the files of the Maritime Commission has failed to discover these documents.

On August 26, 1946, Eastern and the Maritime Commission entered into a contract, made pursuant to the provisions of the Merchant Ship Sales Act of 1946, 50 U.S.C.A.Appendix, § 1735 et seq., to purchase eight war-built vessels from the Commission and to deliver seven old vessels in exchange therefor. The five vessels involved in these suits were included among these seven old vessels and were transferred to the Maritime Commission between August 30, 1946 and September 6, 1946. On August 22, 1947, a credit on the purchase of the war-built vessels was allowed to Eastern on each of these old vessels, as determined by the Commission under § 8 of the Act, 50 U.S.C.A.Appendix, § 1741.

The amount of the credit allowed on each of these vessels when traded in, the total allowance in settlement of the liability for restoration as agreed upon in the correspondence between Scott and Goodwin, and the dead weight tonnage of each vessel are as follows:

| | Trade-in Allowance | Restoration Allowance | DWT |
|---|---|---|---|
| SS Glen White | $14,000 | $23,089.72 | 8680 |
| SS Newton | 14,000 | 18,511.00 | 8270 |
| SS Kopperston | 13,000 | 27,122.80 | 7410 |
| SS James L. Richards | 10,000 | 12,420.72 | 6810 |
| SS Winding Gulf | 14,000 | 15,706.00 | 8870 |
| Totals | $65,000 | $96,850.24 | |

■ Although the United States does not concede the point, these suits are within the jurisdiction of this court and are properly brought under the provisions of the Suits in Admiralty Act. Claims by owners of merchant vessels against the United States arising from the latter's obligations under charters of the vessels must be brought by libel under that Act. Matson Navigation Co. v. United States, 284 U.S. 352, 356–360, 52 S.Ct. 162, 76 L.Ed. 336. These colliers were clearly merchant vessels. They were, during the four months prior to redelivery to the owners and thereafter for a period of about two months until they were conveyed to the United States Maritime Commission, operated solely for the carrying of domestic commercial cargoes. It is not important that during certain weeks of this period they may not have been operated at all, since the Act requires not active use as a merchant vessel but only that the vessel must have had a commercial character when the cause of action arose. Eastern Transportation Co. v. United States, 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472; Shewan & Sons v. United States, 266 U.S. 108, 45 S.Ct. 45, 69 L.Ed. 192.

■ Postponing for the moment any consideration of the effect of the trading in

of these vessels under the Merchant Ship Sales Act of 1946, it is clear that at the time of the redelivery of these ships in July, 1946, the United States, having elected to redeliver them without having removed the armament equipment which had been placed on them, was required under the charter to make a cash payment in lieu of performing such repairs, and that the charter contemplated an agreement by the parties for the discharge of this liability.

█ The negotiations between Scott and Goodwin did in fact result in such an agreement. Scott's letter of September 19, 1946 was an unequivocal offer of a cash payment in return for a release by the owners of their claim for an allowance for reconditioning, and this offer was accepted by Goodwin in his letter of September 23, 1946. The formal addenda to the charters contained the required release in the form drawn by the United States, and these addenda were duly executed by Goodwin on behalf of the owners and delivered to the Maritime Commission. It is true that there is no evidence that any one ever signed these addenda for the respondent. But the contract between the parties had already been made by the letters of Scott and Goodwin, which read in terms of the formation of a present contract. The fact that the parties intended to execute later a more formal embodiment of that contract does not detract from its binding effect, even though the formal embodiment may never have been executed. American Smelting and Refining Co. v. United States, 259 U. S. 75, 42 S.Ct. 420, 66 L.Ed. 833; United States v. Purcell Envelope Co., 249 U.S. 313, 39 S.Ct. 300, 63 L.Ed. 620; Garfielde v. United States, 3 Otto 242, 93 U.S. 342, 23 L.Ed. 779.

Respondent objected at the trial that Scott had no authority to bind the United States by this agreement. (Government in its brief did not argue this point.) Scott's authority as Director, Division of Redelivery of Chartered Vessels, is found in War Shipping Administration, Administrative Order 13, Supplement 18 (Revised) Amendment 1. The pertinent provision reads:

"§.4 *Delegation of Authority.*

"(a) Authority is hereby delegated to the Director, Division of Redelivery of Chartered Vessels, to authorize charterer's repairs, reconversion, removals and restoration, make tenders and settlements, execute agreements subject to clearance by the Legal Division, when the cost of the Government's obligation on any particular vessel does not exceed $10.00 per DWT, and to direct redelivery whenever appropriate * * *."

This authority was continued under the United States Maritime Commission by its order of August 29, 1946, 11 F.R. 9762.

█ The amounts allowed on each vessel were within the limitation of $10 per dead weight ton provided for in §.4(a). Respondent, however, contended at the trial that by virtue of the words "subject to clearance by the Legal Division" the agreement made by Scott and Goodwin could not bind the United States until it had been approved by the Legal Division. That does not, however, appear to be the effect the words were intended to have. From a grammatical viewpoint, the words "subject to clearance by the Legal Division" seem to modify only the words "execute agreements" and to have no reference to the other powers given the Director, such as the power to "make tenders and settlements". Section .2 of this same Administrative Order Amendment provides:

"§.2 *Responsibilities of divisions of WSA in connection with redelivery of vessels.* In carrying out the duties assigned to it, the Division of Redelivery of Chartered Vessels shall coordinate all activities that are involved in termination of charters and the redelivery of vessels, and make such recommendations to the Administrator as may be required. Other organizations shall cooperate with the Division and the Division shall look to them for assistance, particularly with respect to the following:

"(a) The Legal Division, for guidance and legal aspects of charter obligations and the drafting of settlement agreements."

This does not indicate that the Legal Division has any duty with respect to approval of the substance of agreements. Moreover, the various formal documents

in evidence here which were executed by the Commission provide a place for ·the signature of a representative of the Legal Division below the words "Approved as to form". It must be held that the words "subject to clearance ·by the Legal Division" impose no requirement of approval of that Division to make a settlement by the Director binding upon the United States, but are only a directive to ·him to seek the assistance of the Division in the drafting and execution of formal agreements. Hence, Scott had authority to make agreements, binding on the United States, as to the payment of a cash amount to libelants in settlement of the liability of the United States under the charter for restoration of these vessels.

■ It appears from respondent's brief to be the position of the United States that in any event, since the owners in fact have spent nothing for the removal of the armament and equipment from the vessels, there exists no liability on the part of the United States and any contract made by Scott was a promise to make a gratuitous payment which is not binding on the United States. In fact, however, there did exist a real liability under the charter. The United States had contracted to recondition the vessel or to make a cash payment in lieu of such work. It was not a promise to indemnify the owners for any expense to which they might be put. On the contrary, it called for the doing of the work before redelivery, or a cash payment *in advance*. Presumably, this meant in advance of redelivery, and at least in advance of the performance of any work ·by the owner. If the owners had received the cash payment here, there was nothing in the charter which required them to spend that money on repairs to the vessel. It hardly seems possible that the United States would contend that if the owners had continued to operate the vessel for an indefinite period without making the repairs, they would· have been under any duty to return the cash payment to the United States. The owners had suffered damage because their vessels were not restored to the condition in which they were legally entitled to have them on redelivery. They were entitled to be made whole by a monentary payment. Whether or not they would or could use that money to recondition the vessels does not affect their right to it.

The contract between Scott and Goodwin was an agreement on behalf of the United States to make a cash payment in return for Eastern's promise of a release of its claims under the charter (a release which Eastern has in fact executed and delivered to the United States). Thus it was no gratuitous undertaking but a promise to pay money given for a valuable consideration. The agreement is binding upon the United States and the libelants are entitled to payment of the agreed amounts.

The principal contention of respondent seems to be that whatever rights libelants may have had under the charters or any agreement made in settlement of their charter claims, such rights were "absorbed" by the contract for the turning in of these old vessels and the purchase of new ones. By this it apparently means that ·by virtue of this latter contract and of the Merchant Ship Sales Act under which it was made, the allowance made for the vessels which were traded in was meant to effectuate, among other things, a full settlement of the claims of the owners of the vessels based on the charter provisions for restoration and reconditioning of the vessels. No evidence was presented as to the methods used by the ·Commission in determining the value of the vessels traded in or as to how the allowances actually made on these vessels were determined.

·Certainly there is nothing in the statute, nor in the contracts made under it, which expressly says that the liability of the United States for the restoration of these vessels is to be considered as waived or satisfied or otherwise terminated by virtue of the fact that the vessel is traded in in return for an allowance to be credited toward the purchase of a new ship. The United States points to the closing sentence of § 8(b)(1) of the Act, 50 U.S.C.A.Appendix, § 1741(b)(1).[1] This sentence does

---

1. "§ 1741. *Exchange of vessels—Allowance as credit on purchase price: vessels acceptable*
■

\*     \*     \*     \*     \*
"(b) (1) If, prior to December 31, 1946, the owner of a vessel eligible for

not apply to the instance case, for it deals only with the situation where the United States has settled its liability by repairing the vessel, or making a cash payment in lieu thereof. Here the United States has done neither of these things, but has only reached an agreement with the owners as to the amount which will be paid in settlement of their claims. At most, this indicates that it was the policy of the Act that the United States should not, in the case of vessels traded in, allow the full value of the vessel as a trade-in allowance, and also pay the cost of reconditioning them. But it throws no light on how that result was to be accomplished in the situation presented here.

The section does provide that the Commission in determining the fair and reasonable value of the vessel to be allowed as a credit shall consider "(B) any liability of the United States for repair and restoration of the vessel". Such a direction is meaningless unless it results in a change in the amount of the credit from the amount which would be allowed if no such liability existed. Certainly it cannot mean that the credit allowance is to be increased, for that would result in the double payment which the section seeks to avoid. Hence, the meaning must be that where there is an outstanding unsettled liability of the United States for restoration or repair of the vessel traded in, the credit allowance shall be appropriately reduced. Such an interpretation produces an equitable and reasonable result. Where there is an outstanding liability, the trade-in credit is less than it otherwise would be, but the United States is liable for a further payment under the charter. Where the United States had already made the repairs or paid cash therefor to the owner, there remains no liability for the Commission to consider, and the credit allowance will be the full value of the vessel. The results are equalized by the provision that in this latter case the amount of expenditure already made by the United States shall be deducted from the credit allowance.

There is nothing in the section that compels the result for which the United States contends. The fact that when the United States has already made a payment, the amount is deducted from the credit allowance, does not necessarily mean that a restoration liability yet unpaid is to be wiped out. No doubt Congress might have so provided, but a direction to the Commission to consider the liability is hardly to be strained into an extinguishment of the liability. There would be no equity in making the deduction where the United States has already made an expenditure, unless the credit allowance in that case was great-

exchange under subsection (a) makes a firm offer binding for at least ninety days, to transfer the vessel to the Commission in exchange for an allowance of credit provided in subsection (a), the amount of such allowance shall be the fair and reasonable value of the vessel as determined by the Commission under this section. In making such determination the Commission shall consider: (A) The value of the vessel determined in accordance with the standards of valuation established pursuant to Executive Order 9387 (8 F.R. 14105) [set out as note under section 1295 of this Appendix] as of the date of such offer, (B) any liability of the United States for repair and restoration of the vessel, (C) the utility value of the vessel, (D) the effect of this Act [sections 1731–1742 of this Appendix] upon the market value of such vessel, and (E) the public interest in promoting exchanges of vessels as a means of rehabilitating and modernizing the American merchant marine. * * * In any case where the vessel tendered in exchange was acquired from the United States, the exchange allowance under this section shall not exceed the price paid the United States therefor plus the depreciated cost of any improvements thereon. In the case of any vessel tendered in exchange which has been restored to condition by the United States for the purpose of redelivering such vessel to its owner in compliance with the charter of such vessel with the United States, or where, for such restoration a cash allowance has been made to the owner, there shall be deducted from the amount of the allowance of credit for such vessel determined by the Commission under this section, an amount equal to the liability of the United States for such restoration or such cash allowance made to the owner. * * *"

er than where the expenditure was still to be made by the United States.

This view is reenforced by a consideration of the facts as to the allowances actually made in the case of these vessels. In the case of every one of them, the amount agreed upon by Scott and Goodwin in settlement of the restoration liability was greater than the amount of the credit allowed upon the vessel when it was turned in. The total of these differences is in excess of $31,000. If the government's interpretation is correct, the owners by retaining these vessels and collecting the cash allowances for repairs and restoration would have received $96,850.24 and they would still have their vessels. Even if we assume the vessels were absolutely worthless, the owners would still be better off than if they had turned them in and received in all only the $65,000 which was the amount of the actual credit allowance. In the light of such facts as have been presented to the court, there would be no reason for the owners, if the United States interprets the section correctly, to trade-in these old vessels, and the purpose of the Act, which was in part to remove these old vessels from service, would be defeated.

To summarize, then, the only reference in § 8 of the Act applicable to the present case is the direction to the Commission to give consideration to the liability of the United States under the charters. The reasonable explanation is that this requires the adjustment of the amount of the trade-in allowance in the light of the fact that there is an oustanding liability which will entail a further expenditure by the United States. There is no basis for implying a merger of that liability, arising from an entirely distinct transaction, into the trade-in allowance made under the statute, and clearly there is no express provision to that effect.

The libelants are entitled to recover from the United States the amounts agreed upon by Scott and Goodwin in settlement of the charter liabilities of the United States for the removal of the equipment from these vessels. There are other claims under these charters as to which no evidence has been presented, on the representation that the parties are in agreement as to the amount to be recovered by the libelants therefor and, consequently, they will not be dealt with here. There will be a decree in cases numbered 1521, 1523, 1524, 1525, and 1530 for libelants for the amounts found to be due in accordance with this opinion, with costs and interest at four (4) per cent from the date of the filing of the libels until judgment is satisfied. 46 U.S.C.A. §§ 743, 745.